**Cleo LEONARD, Appellant,**

v.

**Mike GAGLIANO et al., Respondents.**

**No. 25296.**

Kansas City Court of Appeals, Missouri.

June 1, 1970.

Motion for Rehearing or Transfer to Supreme Court Denied Oct. 5, 1970.

Application to Transfer Denied Dec. 14, 1970.

---

James Wilson Spencer, D. Robert Schollars, Kansas City, for appellant.

Jack N. Bohm, Glass, Bohm, Hirschman & Rostov, Kansas City, for respondents.

JAMES W. BROADDUS, Special Commissioner.

This is an action to enjoin defendants from maintaining a nuisance, plaintiff alleging that defendants maintain their premises in a "foul, noisy and unsanitary condition." The trial court found in favor of defendants and plaintiff has appealed.

Plaintiff, Cleo Leonard, resides at 619 North Garland in Kansas City, Missouri. Defendants operate a business at 610 North Prospect. Both said streets run north and south. Defendants' property, in fact, runs east and west from Prospect to Garland so that a portion of defendants' property borders plaintiff's property. Both properties are located in an area in Kansas City commonly referred to as the "East Bottoms." Running east and west on the south edge of defendants' property are five railroad tracks, some of which are switching tracks. Plaintiff purchased his home in 1952, and prior to the purchase, plaintiff determined by checking with the City Zoning Board that the house was located in an area zoned M–2, or heavy industry. The entire East Bottoms area is generally one of manufacturing, freight hauling, feed mills, and other types of industry. There are many truck terminals in the area. There are a few residences "interspersed here and there" in the area. More residences are becoming vacant "all the time. They are either moving them or boarding them up." The East Bottoms is an area with no storm sewers and many drainage problems.

Defendants are the sole stockholders of two corporations conducting business at 610 North Prospect, one being "All States Truck Service" which performs minor repairs, painting and cleaning of trucks for truck companies located in the East Bottoms and "Automatic Container, Inc.," which is a trash hauling company for many businesses and apartments throughout the city. The bins in which trash is collected are not brought onto the defendants' premises except when they are empty and in need of repairs or painting. The bins are taken directly from the businesses or apartment houses to the city dump and dumped there. The defendants do not haul garbage and are not licensed to do so. When de-

fendants first occupied their premises in April of 1965, they operated "All States Truck Service" on a twenty-four hour basis for a short time, but for more than a year prior to the trial they were conducting their repair operations only between the hours of eight in the morning and six at night. "Automatic Container" does start operations at 3:30 or 4:00 A.M., but only to dispatch its trucks in time to be at the Bendix Plant no later than 4:00 A.M., as they are required to do by their contract. However, no repair work is performed prior to 8:00 A.M. and the defendants' trucks leaving their premises are no different from those of other trucks in the area leaving their terminals day and night. Defendants' property is protected by two flood lights.

The trains running on the tracks immediately adjoining the defendants' property haul many grain cars to the Ralston Purina Plant which is two blocks west of the plaintiff's and defendants' properties and the General Mills Plant which is two blocks east of their properties and much grain is dropped along the railroad tracks from the moving trains, causing a rat problem in the entire area and, according to the Supervisor of General Sanitary Inspections for the City, there has been a rat problem in the area in question for many years caused from the grain scattered along the railroad tracks. A particularly persistent drainage problem existed on the west edge of defendants' property, close to plaintiff's property, causing water to accumulate and remain for lengthy periods of time, which the plaintiff had accused defendants of being responsible for, but which in fact was the responsibility of the City, as admitted by the city employee, and, in fact, the problem had not existed for almost two years prior to the trial.

Although plaintiff made no complaint to the defendants he made many to the City authorities. As a result Dr. Lloyd R. Gates made at least six investigations of the premises. Dr. Gates has been employed by the Health Department of Kansas City for close to 22 years. He has "had the M.D. training, but graduated in preventive medicine as a doctor or public health." He also has "a B.S. in civil engineering and a master's degree in science and public health and a B.S. in education."

According to the allegations of plaintiff's petition there are five major nuisances which he seeks to enjoin.

The first of these dealt with alleged holes on the defendants' property which accumulated water, which stagnated and bred mosquitoes, etc. The major complaint was to a large water hole which allegedly remained filled for months at a time immediately southwest of plaintiff's house. The evidence showed that because of heavy trucks traveling on defendants' property that chuck holes did occur from time to time; that defendants did from time to time fill the chuck holes and had their property graded three times in the three years they occupied the property and, most important, the major water hole complained of by plaintiff turned out not to be on the defendants' property, but in fact, on the City's property and, as Doctor Gates stated, the accumulation of water was, in this particular hole, primarily the fault of the City and the drainage system in the East Bottoms. Further, this particular water hole had been dry even according to plaintiff's testimony for many months prior to the trial. In addition, the evidence clearly showed that there are no sanitary sewers in the East Bottoms and that the drainage system generally is very bad and that water tends to remain on the surface longer than it would in other portions of the City. However, as Dr. Gates said, at no time did any of the water in the holes on defendants' property show any evidence other than being clear water, with no indication of any breeding of mosquitoes or of any odors.

The next complaint was in reference to odors emanating from the trucks brought onto defendants' premises. Again, Dr. Gates' testimony refutes this assertion. At one time he indicated that he was called by plaintiff claiming that there was garbage in a truck backed up next to the fence between the properties of plaintiff and defendants; that he immediately went there and the alleged garbage turned out to be nothing more than some dirt; that at no time did he find any odors that were harmful to health; that the only odors emanating from the premises were those that normally would come from a business with trucks, diesel fuel, etc.

The next complaint dealt with noises at night. As stated previously, for more than two years prior to the trial the defendants did not operate any garage activities at night; that all repair work was done between 8:00 A.M. and 6:00 P.M. The defendants did dispatch their trucks at 3:30 in the morning, but this was no different from what is done by many of the truck terminals in the immediate area and certainly not in violation of any ordinances.

The next complaint was that defendants kept their property so unclean as to breed rats. The defendants denied having rats on their property but did admit that there were rats in the area generally, caused by all the grain on the railroad tracks immediately south of defendants' property and only approximately 150 feet from plaintiff's house. The most convincing testimony in reference to the rats was that of Dr. Gates who testified that there had been a rat problem in the area for years, caused by the grain falling from the trains along the railroad tracks. Dr. Gates said that rats would not breed on defendants' property because the movement of the trucks would scare them away; that they would have to have a much quieter place to breed, and he found nothing in the way of materials that would be attractive to rats on defendants' property. In fact, of all plaintiff's complaints Dr. Gates said that only one time, the first time he visited defendants' property, did he find a substance that appeared to be some grease around a container, but it had no odor.

The plaintiff also complained about the two flood lights on defendants' property as causing too much light at night, and interfering with his sleep. It is admitted that most of the industries and businesses in the East Bottoms have flood lights which burn all night. The defendants' testimony contradicted the plaintiff's in reference to the fact that the lights did in fact have reflectors; that they were installed by the Kansas City Light Company; that they were installed to prevent vandalism and, because of the community center adjoining defendants' property on Prospect, many people walked across defendants' property at night and, because of the equipment on defendants' property, it was a safety measure for those people who were using the defendants' property to get to and from the community center. Certainly in this day and age of so much burglary and vandalism it is not unreasonable to light up premises at night for protection. In fact, many places such as churches and schools, even in residential areas of the City, are now flood lighting their premises at night in order to prevent vandalism.

The law governing the instant case was clearly stated by the St. Louis Court of Appeals in the case of Fuchs v. Curran Carbonizing and Engineering Company, Mo. App., 279 S.W.2d 211.

"A man is entitled to the maximum protection that the law can afford him and the comfortable enjoyment of his home under the conditions existing in that locality, consistent with the rights of others, but there is bound to be a certain amount of inconvenience and interference with the absolute enjoyment of one's home as an inevitable incident to its location in a populous center, and *particularly in an area zoned for industrial purposes.* Persons living in cities and towns must necessarily submit, without legal recourse, to the annoyances, and discomforts incidental to municipal life, *including the conduct of those commercial*

*enterprises which are properly located and carried on in the neighborhood* where they reside and which are necessary for trade and commerce and the comfort and progress of the public at large. (Citing cases) \* \* \* What would be an unreasonable interference with the comfortable enjoyment of one's home in a residential area might be regarded as the normal, expected and inescapable concomitant of modern social conditions in an industrial section." (Emphasis ours)

The trial court found "that the area in which plaintiff lives and defendants carry on their business is zoned M-2-A by the City of Kansas City, Missouri, which zoning is for heavy industry; that the area in evidence was zoned for heavy industry in 1923, many years before plaintiff purchased his home and that plaintiff had knowledge when he bought his home that it was an area zoned for heavy industry; that the businesses carried on by defendants at the location in evidence are legitimate businesses to be conducted within an area zoned for heavy industry; that although the court finds that defendants have created certain unpleasant noises and odors, that such are not in any way injurious to the health and comfort of plaintiff, who voluntarily chooses to live in said area, to such an extent as to create a nuisance."

We have examined the many cases cited in plaintiff's elaborate brief. However, by reason of the facts appearing in the transcript, we do not consider those cases applicable.

The trial court arrived at the correct conclusion. The judgment should be affirmed. Your Special Commissioner so recommends.

PER CURIAM.

The foregoing opinion by JAMES W. BROADDUS, Special Commissioner, is hereby adopted as the opinion of the Court and the judgment is affirmed.

All concur.